Thomas H. Fisher and Chester Bowles, Administrator, Office of Price Administration, Appellees, v. Michigan Square Building Corporation, Appellant.

Gen. No. 43,633.

Opinion filed February 28, 1946.
Released for publication March 26, 1946.

See also case reported on p. 323, post.

Scott, MacLeish & Falk, of Chicago, for appellant; Cranston Spray, Robert S. Cushman and Thomas F. Hirschauer, all of Chicago, of counsel.

Norman Crawford, of Chicago, for certain appellee.

George Moncharsh, Milton Klein, David London and Abraham H. Maller, for intervenor appellee; Amos J. Coffman and George E. Leonard, regional attorneys.

Mr. Justice Scanlan delivered the opinion of the court.

Thomas H. Fisher, plaintiff, filed a complaint seeking a preliminary and permanent injunction to recover possession of certain space on the tenth floor of the Michigan Square Building, 540 North Michigan avenue, Chicago, Illinois, from which he had been evicted by Michigan Square Building Corporation, defendant, the owner of the property. Chester Bowles, Administrator of the Office of Price Administration, intervened in the cause; the Emergency Price Control Act contains a provision that the Administrator is specifically authorized to intervene in any suit or action wherein a party relies for ground of relief or defense upon the Emergency Price Control Act or any Regulation issued thereunder.

The case was tried by the chancellor and after evidence heard the following permanent injunction order was entered:

"This matter coming on to be heard upon the complaint of Thomas H. Fisher, the complaint of Chester Bowles, Administrator, Office of Price Administration, intervenor, herein, and the answers of the defendants herein and the Court having examined the pleadings and heard the evidence submitted in this matter and the arguments of counsel and finding that it has jurisdiction of the subject matter herein and of the parties hereto, the Court finds:

"1. That defendant, Michigan Square Building Corporation, an Illinois corporation, is the owner of the building known as the Michigan Square Building and located at 540 North Michigan Avenue, Chicago, Illinois, within the Chicago Defense-Rental Area.

"2. That the space within said building designated as the north end of the tenth floor of the Michigan Square Building was on March 1, 1942 and at all times thereafter, to and including August 11, 1945 occupied by the plaintiff, Thomas H. Fisher, as housing accommodations, said tenant having expended approximately $10,000 in the alteration and re-modeling of such space for the purpose of making it available as and for housing accommodations, and as such housing accommodations is subject to the provisions of the Rent Regulation for Housing.

"3. That on August 11, 1945 the defendant unlawfully evicted the plaintiff, Thomas H. Fisher, from possession of said housing accommodations without recourse to legal process and without the compliance with the provisions of the Rent Regulation for Housing, in violation of Section 6 thereof, and Section 4 of the Emergency Price Control Act of 1942, as amended.

"4. That the defendants, Illinois Properties, Inc., an Illinois corporation, William J. Shoeninger, James W. Pope and George Edler have no claim or interest in said premises and that this complaint should, therefore, be dismissed as to such defendants.

"It Is Therefore Ordered as follows:

"1. That the complaints herein be dismissed as to Illinois Properties, Inc., an Illinois corporation, William J. Shoeninger, James W. Pope and George Edler for want of equity.

"2. That the defendant, Michigan Square Building Corporation, its agents, servants, employees, attorneys and all other persons in active concert or participation with it be, and they are hereby, permanently enjoined from directly or indirectly evicting, threatening or attempting to evict by exclusion from possession, elimination or decrease of essential services, or otherwise, the plaintiff, Thomas H. Fisher, tenant of the housing accommodations described as the north end of the tenth floor of the building known as the Michi-

gan Square Building located at 540 North Michigan Avenue, Chicago, Illinois, in violation of or in any way contrary to the provisions of the Rent Regulation for Housing.

"3. The defendant, Michigan Square Building Corporation, be and it is hereby ordered and directed forthwith to restore the above-named Thomas H. Fisher, tenant, to possession of the housing accommodations formerly occupied by said tenant as heretofore described and to restore all the property of said Thomas H. Fisher to said premises which said defendant has removed therefrom."

Defendant appeals from the above order.

The Michigan Square Building is a ten story building, eight stories of which were devoted to various commercial uses. The defendant, Michigan Square Building Corporation, is a wholly owned subsidiary of Time Incorporated, a New York corporation, publisher of the magazines Time, Life, Fortune and Architectural Forum. About March 1, 1945, defendant acquired the building from the Northwestern Mutual Life Insurance Company, the then owner of the fee, and Illinois Properties, Inc., a wholly owned subsidiary of the insurance company, which had a leasehold interest in the building. The building was purchased by defendant in order to obtain space for conducting the circulation operations of the Time magazines.

Plaintiff had occupied the premises in question for fifteen years at the time of the eviction. On September 22, 1930, there was a ten year lease drawn between plaintiff and MacChesney-Rubens-Wolbach Syndicate, the then owners of the property, for "that portion of the tenth floor (second floor of penthouse) as shown on the blueprint attached hereto and marked Exhibit 'A', and by reference hereto made a part hereof in Michigan Square . . ." The lease provided "That the Lessee will use and occupy said premises for —— studio —— and for no other use or purpose . . ." Rule 19 of the Rules and Regulations

attached to the lease reads: "The premises leased shall not be used for lodging or sleeping . . ." On September 25, 1940, a new lease was executed between plaintiff and Michigan Square Building Corporation. The term was for three years, commencing November 1, 1940, and ending October 31, 1943; this lease also contained Rule 19. On October 13, 1943, a lease was executed between plaintiff and Illinois Properties, Inc., the then owner of the premises. Plaintiff's premises were described as "the Premises, known as the studio space at the north end of the tenth floor, in Michigan Square . . . to be occupied and used by the Lessee for —— studio ——." Paragraph "O" of the Rules and Regulations of this lease reads as follows: "Unless the Lessor gives advance written consent in each and every instance, the Lessee shall not install or operate any steam or internal combustion engine, boiler, machinery, refrigerating or heating device or air-conditioning apparatus in or about the premises, or carry on any mechanical business therein, or use the premises for lodging or sleeping purposes, or do any cooking therein, or use any illumination other than electric light, or use or permit to be brought into the Building any inflammable oils or fluids such as gasoline, kerosene, naphtha and benzine, or any explosives or other articles deemed extra hazardous to life; limb or property." The term commenced November 1, 1943, and ended October 31, 1945. This lease provided that "The Lessee will occupy and use the premises during the term for the purpose above specified and none other . . . without the advance written consent of the Lessor . . ."; it also provided that "the lessor shall have the right to cancel this lease at any time during the term hereof, for any reason whatsoever, by giving the lessee sixty (60) days' previous written notice of its intention so to cancel."

The primary question before the chancellor was, whether the premises involved were "housing accommodations" as defined by the Rent Regulation for

Housing. If they were "housing accommodations," then the provisions of the Rent Regulation are applicable and defendant did not have the right to evict plaintiff. At the conclusion of the evidence the chancellor delivered an opinion so comprehensive that we deem it advisable to cite it *in toto:*

"DECISION OF THE COURT.

"The Court: As the Court views it the primary question in this case revolves around whether this is housing accommodation or whether this is business or commercial use. If it is housing accommodation then admittedly the Federal Rent Control Act applies. If it is business or commercial in any sense, then that act does not apply and the parties complainant here have no right of action.

"It appears clearly from this evidence that in 1930, September 22nd, the then owners of this building now known as the Michigan Square Building, entered into a lease with the complainant Fisher, and the lease demised the premises described in the lease as 'That portion of the tenth floor, second floor of penthouse, as shown on the blueprint attached hereto marked Exhibit A and by reference made a part hereof.'

"So that in the description there of the premises, the demised premises, it is referred to as a penthouse. And in the second clause with respect to restricted use it provides 'That the lessee shall use and occupy said premises for studio and for no other purpose.'

"It appears clearly here that this blueprint attached to the lease showed a plan of remodeling of the premises, the demised premises. The premises as originally built was left unused after completion because the landlord had no particular use to make of this section of the premises; as Mr. Wolbach testified he didn't know whether they were going to use it for purely storage purposes or what purpose they could use it for. They had apparently no idea of using it as office space because it was impracticable, since the elevator only

went up to the eighth floor, and this was on the tenth floor. And so there was no intention originally to adapt the particular demised premises to any office space such as was found in the other floors of the building except the ground floor, which was adapted to stores and shops and so on.

"The plaintiff came along here with a plan of remodeling the premises in question, and for that purpose submitted sketches showing the intended plan of remodeling or alterations. Mr. Wolbach admitted he received such or had known of such, he had left it entirely to Holabird & Root, his architects, to approve of the type of remodeling proposed.

"It appears clearly here that the remodeling resulted in the installation of a kitchen, a gas range, refrigerator, kitchen cabinets,—the type of improvement that could be expected and found in the average kitchen of any living quarters.

"A bathroom was also provided for, including a tub and shower and toilet cabinet. There was then a large room referred to by some as a studio room and by the complainant Fisher as a living room. The dimensions were shown here to be quite considerable for the living room or studio room, wherein the south wall of this space was entirely mirrored, including the doors. I believe there were two doors that led to storing of clothing space or clothes closets, and behind which there was accommodation for storaging or hanging or keeping of personal wearing apparel.

"There was involved in these remodeling plans a method of drawing curtains between the so-called studio room or living room and an alcove in which was installed two Simmons beds. Some referred to them as studio couches but the architect who designed the type and the architect who provided for its installation and method of fastening to the wall so that it would not slide out when in use, provided a method of hooking it on to the back wall that was built for this type of bed.

"There were two such backs built for these so-called studio couches, or as the complainant referred to them as Simmons beds, mattress and springs, pillows and other coverings. These curtains could divide this so-called sleeping space from the studio room or living room.

"In addition to that there was a fireplace built in, which had not been there before, and the architect planned for the installation of a chimney or the connection of the fireplace with the opening that could be used as a chimney, which was used for additional heat required in the winter, because of the lowering of the heat pressure during the weekend when the shops and offices in the rest of the building were closed.

"It appears here clearly from this evidence and without contradiction that the plaintiff has spent over $10,000 in the remodeling, original planning and remodeling of this space, the cost of which was indicated clearly to the then owners. And in the course of the work done apparently the owners had received some bills for extra carpenter work and transmitted to the plaintiff by the then owners and the plaintiff paid them.

"It appears here clearly too that the original lease was for ten years, and subsequently an exact type of lease or similar form of lease was entered into in 1940, for a period of three years. And in 1943 a similar lease, I think for two years. Is that correct?

"Mr. Spray [counsel for defendant]: Yes, sir.

"The Court: If I happen to be mistaken in some particular the counsel might correct me, but I think those are the facts.

"It appears that throughout the period of the first lease they had a maid, a colored maid, who did the cooking and who took care of this space, whether you call it living space, living quarters or studio. She prepared the meals for the complainant and his wife and removed the garbage daily. There was delivery of

milk and food products to the space in question by elevator service. And after all of these alterations and remodeling had been completed it was found objectionable by the management of the building to have small articles delivered to that space or apartment, which required the elevator to go to the eighth floor, when there otherwise might be no need for it, hence a rear entrance directly to the kitchen was installed, a metal staircase, so that these deliveries could be made without the necessity of having the elevator go up for each small article.

"The elevator operator who was in charge of that building from seven o'clock in the evening until seven o'clock in the morning—those hours, I think, are correct—had occasion to observe the plaintiff and his wife come and go, day by day or every other day or during the week. He observed them coming in at late hours to occupy that space. He observed that they had company come there from time to time, they received guests and guests stayed at late hours,—they left at late hours. He knew that food was being brought up there and food was delivered. He knew that the plaintiff and his wife had not left the building during his hours of service and indicated that they remained there over night every night, except during a period of the summer when it appears from this evidence, and undenied, this plaintiff and his wife occupied a home in Winnetka, and that during the period in the summer months when they occupied the house in Winnetka they occasionally used this studio space in the building in question to remain over night or to use it for incidental reasons but not to stay there as regularly as during the winter.

"That the plaintiff and his wife occupied that space for living quarters there can be no question. They slept there, lived there, had their meals there, meals were prepared and they had a servant there; that the building knew that they were using that for living

quarters there can be no question, from all of this evidence.

"The building had access to this space by use of a pass key, and on some occasions the manager of the building and the superintendent made routine inspection, as they call it. There was nothing to stop them from going through the entire apartment and there was nothing to stop them from knowing what use the premises were adapted for. As a matter of fact, one of the managers of the building admitted he saw these beds; he called them couches, studio couches. But as against his impression of what they were the architect who provided for them and installed them, he knew better than the mere observation or impression that the superintendent of the building had, that they were beds, they were made up for use as beds and they were actually occupied as beds every night when the lessees were in the city during the winter, except for the summer months.

"There was one occasion when the manager of the building went into the kitchen. He said he saw some canned goods there, he didn't know what brand but he did see food there. They saw clothing, wearing apparel, in the places provided for the keeping of the wearing apparel of the complainant and his wife. But in addition to that he saw some costumes.

"Now, it is claimed here and argued that 'studio' has a definite meaning, according to the dictionaries, the standard dictionaries. It may have a defined meaning in the dictionaries but there is nothing to prevent parties from using the same term to mean something else. As a matter of fact the Court can almost take judicial notice, because it is so universally known, that there is such a thing as studio apartments and so advertised daily and so generally recognized that it is an accepted fact. Apartments are so built these days that they are called 'studio apartments.'

"Now, what does 'studio' mean as used in this lease or in these leases? Certainly, if the parties by their conduct, by their understanding, have placed an interpretation upon this term 'studio' then the Court will accept that interpretation which has been placed upon it by the conduct of the parties.

"It is said that it was understood by the owners, successive owners, that this would be used as a studio and intended to be used as a studio, and throughout the entire leasing there was no other intention except that it be used as a studio, and the definition in the dictionary is offered which means a use for some educational, dramatic, artistic purpose, such as music, dancing and the like.

"It is a peculiar coincidence here in this case that if that was the intended use of the premises to be used as a dancing studio, because Ruth Page was known as a professional dancer, the wife of this complainant, and it was expected and intended that that space be used for giving dancing lessons or to be employed as a dancing studio, that the management should have taken occasion to investigate a complaint made because of the use of a piano and the making of some noise that interfered with the tenants below, as a result of some dancing and the playing of a piano. And on that one occasion referred to and testified to here the management representative went up there, looked in, and he heard the piano playing and he thought he saw somebody in costume dancing.

"Why investigate that kind of a complaint if they knew that was the purpose of the use of the studio? If they knew that that was the use that was to be made of that space, why investigate it? They knew that there was to be a piano, would have to be a piano used or some kind of music used in connection with the dancing, I assume, to keep the proper rhythm. The fair inference is that if that was to be used as living

quarters, why all the noise that the tenants downstairs were complaining about?

"The conduct of the lessors originally and the knowledge of the management of the building under the subsequent lessors would clearly show that they not only knew, that the premises were used for living quarters, but by their conduct have placed a construction upon the use of the term in the lease, 'studio', as including living studio, living quarters. This Court cannot judicially say that the 'studio' may not include living quarters. If it does, by the conduct and acquiescence and understanding of the parties here constitute a construction that would include living quarters then the rent regulation act would apply here, even though the rest of the building was completely used for commercial purposes. There is nothing to prevent any building from appropriating any part of its building for living quarters, if it so chooses.

"Now, has a forfeiture been sought here by any of these lessors, original or subsequent, on the ground of a violation of the terms of the lease? Have they given notice here to the lessee at any time of the right and desire to forfeit this tenancy because of a breach of the covenant in the lease against the use of the premises other than that designated? No, there is no such notice. The notice that was actually given dated January 29th was, 'You are hereby notified that we have elected to exercise our right as lessor in such lease to terminate your lease, pursuant to the provisions of Section 18 thereof. Accordingly, your lease is hereby terminated.'

"There is a rule well settled in law that where you express specifically your reason for forfeiture and give notice of it, you may not thereafter include in such right to forfeiture some other reason which you haven't included in your notice. '*Expressio unius est exclusio alterius*', expression of the one excludes all others.

"You definitely took the position you were forfeiting or sought to forfeit on the ground provided or for the reasons provided in Section 18, and he agrees: 'It is further understood and agreed the lessor shall have the right to cancel this lease at any time during the term hereof for any reason whatsoever, by giving to the lessee 60 days' previous written notice of its intention to so cancel.'

"The only reason given is 60 days, no other reason given. It is the right to cancel on notice, 60 days' notice, at any time. It was not because of any breach and no notice is given here of any breach of the covenants of the lease.

"Now, this 60-day clause could be enforced except for the fact that the rent control act doesn't permit it without a certificate of consent from the Price Rent Control Administrator. No such application for consent was made and no such certificate of right was granted and it was treated entirely upon the basis that the rent control act did not apply, this being commercial use and not housing accommodation.

"If this Court concludes, as it does, that it is housing accommodation, then the rent control act does apply and there is no right of the lessor to cancel on 60 days' notice.

"In view of what the Court has said there will be a mandatory injunction issued here restoring the complainant to the possession of the premises in question. You may prepare a decree."

The following are the grounds upon which defendant bases its contention that the permanent injunction order should be reversed:

"I.

"The demised premises involved in this case are not subject to the OPA Rent Regulation for Housing.

" (a) The application of the OPA Rent Regulation for Housing is limited to premises rented or offered for rent for living or dwelling purposes.

"(b) The premises here involved are located in a commercial building and were leased under a commercial form of lease for studio purposes with express provisions which prohibit the use of the premises for living or dwelling purposes.

"II.

"The lease of October 13, 1943 was not modified either expressly or by implication, nor was the prohibition against the use of the demised premises for living purposes waived.

"(a) There can be no implied modification of a lease or waiver of a lessor's rights thereunder by lessor's conduct unless it unequivocally appears that he has clearly intended to relinquish his right to insist upon a strict compliance with the terms of the lease.

"(b) Even where the lessor's knowledge and consent has been held to constitute an implied waiver of a continuing breach it does not operate to give the lessee a vested right to continue the violation or result in a modification or amendment of the lease.

"III.

"After the termination of the lease defendant had the right to retake possession of the demised premises as it did."

Defendant argues, at some length, that the premises are located in a commercial building and were leased under a commercial form of lease for studio purposes with express provisions which prohibit the use of the premises for "lodging or sleeping" purposes, and that the trial court erred in modifying the plain language of the lease by holding that the word "studio" has not a definite meaning and that the parties in the instant case had placed a construction upon the use of the word "studio" as including living quarters. In our view of this appeal it is unnecessary to pass upon the construction that should be given the lease tested by its verbiage alone. The chancellor held: "That the plaintiff and his wife occupied that space for living

quarters there can be no question. They slept there, lived there, had their meals there, meals were prepared and they had a servant there; that the building knew that they were using that for living quarters there can be no question, from all of this evidence." That the great weight of the evidence sustains this finding of the chancellor cannot be reasonably questioned. In addition to the facts stated in the chancellor's opinion we will cite a few additional facts: Prior to the time of the execution of the 1930 ten year lease, two-thirds, at least, of the space in the building was unoccupied. The great depression was on. The elevator service ended at the eighth floor. The tenth floor was "waste space" and had no value save as a possible future storage space for the building. The owners "were desperately anxious to get any revenue from it they could. The space had no commercial value whatsoever." The evidence shows that the said lease was executed upon the understanding that plaintiff would be permitted to remodel and decorate the space at his own expense so that it could be used for dwelling purposes. The architect employed by plaintiff drew up plans and specifications for remodeling the space so as to make it a dwelling unit and the plans and specifications were submitted to the then owners, and thereafter the space was altered and remodeled, at an expense to plaintiff of approximately $10,000, into what constituted a place for living and dwelling purposes. During the fifteen years that plaintiff occupied the premises it was the only place used by him and his wife as a home save that in the summer months they occupied a place in Winnetka for a summer home. Visitors and guests came to the premises, and plaintiff and his wife gave dinner parties there. During the entire period they had a colored maid, who cooked the meals. Food and other articles were delivered to the place daily during all of the period. Some time after plaintiff took possession of the premises he was

granted permission to build, at his own expense, a special metal staircase, which led directly to the kitchen, and thereafter all of the food and other articles were delivered to the kitchen. He was also allowed to build, at his own expense, a fireplace, because the landlord, during the depression, in order to save fuel, allowed the heat to go down on weekends. Plaintiff and his wife in voting and in the matter of tax payments gave the premises as their home. Defendant argues that plaintiff's wife was a well known professional dancer and that it had a right to assume and did assume that the premises were used solely for the purposes of a studio wherein she taught dancing, but the evidence conclusively shows that plaintiff's wife never used the premises for any such purpose and that during the fifteen years' period she had a professional studio elsewhere. In his opinion the chancellor exploded the claim of defendant that the owners of the building assumed that the premises were being used only as a dancing studio by plaintiff's wife. The argument of defendant that neither it nor any of the former landlords knew that Fisher was using the premises for dwelling purposes is absurd.

Defendant contends that the premises are not subject to the OPA Rent Regulation for Housing and therefore it had the right to cancel the lease in accordance with its terms. Defendant argues that the Emergency Price Control Act of 1942 limits its scope to "housing accommodations"; that the instant lease, a "bona fide contractual arrangement between the parties permits the tenant to occupy the space for office, store, loft, manufacturing, amusement or any other than living or dwelling purposes," and that therefore "the OPA Rent Regulation does not apply and the rights of the parties are governed by the lease which they execute"; that the premises "are located in a commercial building and were leased under a commercial form of lease for studio purposes with

express provisions which prohibit use of the premises for living or dwelling purposes," "and consequently the premises were clearly not within the scope and effect of the OPA Rent Regulation for Housing." In a short, excellent brief filed by the Administrator, he makes the following forceful statement: "The use of a commercial form lease does not disprove the leasing of the premises for living quarters. It is a common practice for lessors to use but one form of lease for all tenants in a building. While the Administrator does not contend that the use of this form of lease in this case was a subterfuge, nevertheless, to decide this issue on the basis of the form of the lease would open the door to future evasive practices by landlords. Indeed, it would become a simple matter for landlords to evade the regulation by the use of commercial form lease." Upon the oral argument counsel for the Administrator argued that it would be a serious blow to the "Rent Regulation for Housing" if the instant contention of defendant were sustained; that it is the theory of the Government that the rent regulations are applicable where the premises were rented *or used for dwelling purposes,* and in his brief states that "the primary question in this case is whether the premises involved are 'housing accommodations' as defined by the Rent Regulation for Housing. If the premises are housing accommodations, then the provisions of the Regulation are applicable, and the defendant could not evict the plaintiff Fisher." The Administrator further contends that the fact that the premises were situated in a commercial building does not negative the renting of the premises for living quarters; that *"particularly is this true in the case at bar, where it appears from the evidence that the space was never used for commercial purposes and was, in fact, located two floors higher than the elevator could go.* As the Chancellor found, 'there is nothing to prevent any building from appropriating any part of its building for living

quarters, if it so chooses.' '' (Italics ours.) We hold that the lease itself does not determine the question before us. But defendant argues that there can be no implied modification of a lease or waiver of a lessor's rights thereunder by lessor's conduct unless it unequivocally appears that he had clearly intended to relinquish his right to insist upon a strict compliance with the terms of the lease. The chancellor saw and heard the witnesses, and we agree with his finding that the original lessor, the subsequent lessors, and plaintiff, all contemplated that the premises would be used for living quarters. A *fortiori,* that all of the lessors acquiesced in the use of the premises for living quarters clearly appears from the evidence. As the chancellor noted in his opinion, defendant did not, in the notice given to the plaintiff, rely upon the ground of any violation of the terms of the lease, and that it relied entirely, in the notice, upon its alleged right to terminate the lease pursuant to the provisions of section 18,· which provides: ''It is further understood and agreed that the Lessor shall have the right to cancel this lease at any time during the term hereof, for any reason whatsoever, by giving to the Lessee sixty (60) days' previous written notice of its intention so to cancel.'' In view of the fact that plaintiff spent over $10,000 in order to improve the premises and to make a home for himself, and that he had a home there for fifteen years, it would be highly inequitable to determine the instant appeal solely upon the verbiage of the several leases. It is a settled principle of law that rights arising under sealed instruments may be waived by parol, and the instant case is clearly one where that principle should be enforced. Defendant concedes that it purchased the building in order to obtain space for conducting the circulation operations of the Time magazines, and it appears that as soon as plaintiff was evicted the possession of his premises was turned over to Time Incorporated, of which de-

fendant is a subsidiary, and we think it is a reasonable assumption from the evidence that it was decided to pay no attention to the rights of plaintiff in the premises and to evict him at night and while he was living in his country home. It was certainly harsh treatment toward a man who had lived in the premises for fifteen years and had spent thousands of dollars in improving it, and who had notified the agent of the building in January, 1945, of his rights under the Emergency Price Control Act. But defendant contends that when it bought the building the lease of October 13, 1943, was in force and that it had a right to rely upon the terms of the lease; that "in the instant case there was a failure to show knowledge on the part of the lessor [defendant] that plaintiff Fisher was using the premises for living or dwelling purposes in violation of the terms of the lease."

"But, although other courts have held the doctrine of notice by possession as subject to being materially modified by circumstances, this court has uniformly held that actual occupancy is equal to the record of the deed or other instrument under which the occupant claims, and a purchaser is bound to inquire by what right or title he holds. The purchaser takes the premises subject to that title or interest, whatever it may be. *Dyer v. Martin,* 4 Scam. 147; *Brown v. Gaffney,* 28 Ill. 150; *Doyle v. Teas,* 4 Scam. 202; *Williams v. Brown et al.,* 14 Ill. 201; *Davis v. Hopkins,* 15 id. 519; *Prettyman v. Wilkey,* 19 id. 241; *Truesdale v. Ford,* 37 id. 210; *Lumbard v. Abbey,* 73 id. 178; *Whittaker v. Miller,* 83 id. 386; *Strong et al. v. Shea,* id. 575." (*Coari v. Olsen,* 91 Ill. 273, 280.)

We have carefully considered defendant's labored argument in support of its contention that it did not know that plaintiff was using the premises for living or dwelling purposes, and we find ourselves in full accord with the finding of the chancellor that it had knowledge of the situation. It had a pass key to all

of the places of the tenants in the building and the simplest investigation would have disclosed the obvious situation as to the premises occupied by plaintiff. Had it consulted Hogan & Farwell, Inc., who were the agents of the owners of the building from 1940 to 1945, it would have learned that Fisher sent it a letter, on January 17, 1945, asserting his rights to continue his occupancy of the premises under the Federal Act and Rent Regulation. A simple inquiry of Fisher, a prominent lawyer at the Chicago bar, would have disclosed the situation. Wendell B. Ward, the vice president of Time Incorporated and also vice president of defendant corporation, testified for the latter. He stated that he took an active part in the negotiations for the purchase of the Michigan Square Building and that he made a personal inspection of all of the premises prior to the signing of the contract, but that he did not examine the premises above the eighth floor; that he also examined the existing leases. The following then occurred: ''Q. [by the court]: And discussed all of them with the parties in interest? A. That is right. That is a correct statement.'' That was a proper procedure for defendant to follow but it did not follow it as to plaintiff. He further testified that after the eviction Time Incorporated was given possession of the premises. William J. Schoeninger, defendant's manager of the building, testified that as said manager he had the right to enter the premises; that he made a routine inspection of plaintiff's premises in March or April, 1945; that between March 1 and June 1 he made a routine inspection of the premises; that prior to August 11 he inspected the premises and that he was present in the premises at the time of the eviction on August 11. This witness attempted to hide the real situation that he found in the premises upon these inspections. To illustrate: He stated that he saw there a couple of *studio* couches, when the evidence shows beyond all reasonable doubt that there were two Simmons beds in the premises. Despite his

effort to support the opinion he expressed, that it looked more like a studio than a home, his evidence when analyzed supports plaintiff's claim as to the character of the premises. This witness testified that he was in the premises just prior to August 11, and he superintended the eviction.

It is plain from the record that plaintiff had no trouble in his occupancy of the premises as a home until defendant took possession of the building, and that his trouble commenced when it was found that Time Incorporated needed all the space in the building from the fourth floor to the tenth, inclusive.

After a careful consideration of this appeal, we have reached the conclusion that the permanent injunction order of the Circuit court of Cook county should be and it is affirmed.

*Permanent injunction order affirmed.*

FRIEND, P. J., and SULLIVAN, J., concur.